# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>NINE ELECTRONIC DEVICES ALL CURRENTLY<br>LOCATED AT NAVAL CRIMINAL INVESTIGATIVE<br>SERVICE DCWA EVIDENCE REPOSITORY | )<br>)<br>)<br>)<br>)<br>)  Case No.  19-sw-268 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Redmond_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 875(c) | "Interstate Transmission of Threats in Interstate Commerce" |
| 18 U.S.C. Section 844(e) | "Willfully Making a Threat" |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Kelli D. Johnson, Special Agent-NCIS
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____07/25/2019_____

_____
*Judge's signature*

City and state:  Washington, DC

Deborah A. Robinson, Magistrate Judge
_____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    19-sw-268 |
| NINE ELECTRONIC DEVICES ALL CURRENTLY | ) | |
| LOCATED AT NAVAL CRIMINAL INVESTIGATIVE | ) | |
| SERVICE DCWA EVIDENCE REPOSITORY | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____August 7, 2019_____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.          ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Deborah A. Robinson_____ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*     ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____07/25/2019 3:00 pm_____          _____
                                                                                                                      *Judge's signature*

City and state:      _____Washington, DC_____          _____Deborah A. Robinson, Magistrate Judge_____
                                                                                                            *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    19-sw-268 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                                *Executing officer's signature*

                                                               _____
                                                                       *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is (1) Silver Maxtor Hard Drive, Serial Number A3BFPDGC; (2) Passport Hard Drive, Serial Number WX81A75FSPFJ; (3) Black Verizon Motorola Cellular Telephone, Model Number XT912; (4) Black front and Silver back IPOD, Serial Number CCQN7FHFMJF and Model Number A1421; (5) Black and Red San Disk USB; (6) Red or Purple and Silver USB; (7) Silver Memorex CD; (8) Silver Memorex CD; and (9)Sony VAIO Laptop Computer, Model Number SVF242C2PL, hereinafter the "Devices." The Devices are currently located at Naval Criminal Investigative Service DCWA Evidence Repository, 2713 Mitscher Rd., Building #168, Suite 200, Washington, D.C. 20373.

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Interstate Transmission of Threats in Interstate Commerce), in violation of 18 U.S.C. § 875(c), and (2) Willfully Making a Threat, in violation of 18 U.S.C. § 844(e), as described in the search warrant affidavit, including, but not limited to:

      a.   evidence of ownership, contacts, and address books, call logs, phone books, photographs, images, text messages, contact information, voice mails, videos and any other stored electronic data for the threats to Rebecca Snyder, "Rebecca," "Alex," "Brett," "Ashley," "Andrew," and any other person related to the threats incidents as described herein;

      b.   Records and information relating to the transmission of threats in interstate commerce and threats to Rebecca Snyder, "Rebecca," "Alex," "Brett," "Ashley," "Andrew," and any other person related to the threats incidents set forth in the Affidavit;

      c.   Records and information relating to unauthorized access of computers at the Washington Navy Yard;

      d.   Records and information relating to Rebecca Snyder, "Rebecca," "Alex," "Brett," "Ashley,"  "Andrew," and any other person related to the threats incidents set forth in the Affidavit;

      e.   Records and information relating to the e-mail account amreid21@hotmail.com;

f.  Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact;

g.  Records and information relating to malicious software;

h.  Records and information that constitute evidence of the state of mind of Anthony M. Reid, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

i.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with Anthony M. Reid about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

j.  evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

k.  evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.   evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

m.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

n.   evidence of the times the Devices was used;

o.   passwords, encryption keys, and other access devices that may be necessary to access the Devices;

p.   Information stored on the Device that may be necessary to access the Device or to conduct a forensic examination of the Device;

q.   documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

r.   records of or information about Internet Protocol addresses used by the Devices; and

s.   records of or information about the Devices's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF**

**Silver Maxtor Hard Drive, Serial Number A3BFPDGC;**

**Passport Hard Drive, Serial Number WX81A75FSPFJ;**

**Black Verizon Motorola Cellular Telephone, Model Number XT912;**

**Black front and Silver back IPOD, Serial Number CCQN7FHFMJF and Model Number A1421;**

**Black and Red San Disk USB;**

**Red or Purple and Silver USB;**

**Silver Memorex CD;**

**Silver Memorex CD;**

**Sony VAIO Laptop Computer, Model Number SVF242C2PL;**

**ALL CURRENTLY LOCATED AT**
**Naval Criminal Investigative Service**
**DCWA Evidence Repository**
**2713 Mitscher Rd., Building #168, Suite 200**
**Washington, D.C. 20373**
**UNDER RULE 41**

**SW No. __19-sw-268_____**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kelli Johnson, Special Agent with the Naval Criminal Investigative Service, Washington Field Office, Washington, D.C., being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – (1) Silver Maxtor Hard Drive, Serial Number A3BFPDGC; (2) Passport Hard Drive, Serial Number WX81A75FSPFJ; (3) Black Verizon Motorola Cellular Telephone, Model Number XT912; (4) Black front and Silver back IPOD, Serial Number CCQN7FHFMJF and Model Number A1421; (5) Black and Red San Disk USB; (6) Red or Purple and Silver USB; (7) Silver Memorex CD; (8) Silver Memorex CD; and (9)Sony VAIO Laptop Computer, Model Number SVF242C2PL which are currently located  in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with the Naval Criminal Investigative Service ("NCIS").  I have been working with NCIS since October 1, 2018.  Before arriving to the Washington, D.C. Field Office, I attended training at the Federal Law Enforcement Training Center, Glynco, GA.  I completed the Criminal Investigation Training Program and the Special Agent Basic Training Program.  I received training in conducting investigations, interviewing, legal, cyber, physical evidence, firearms, and tactics.   As a NCIS special agent, my responsibilities include

investigating criminal matters/violations of the Uniform Code of Military Justice and United

States Code including violations of 18 U.S.C. § 875(c) (Interstate Communications of Threats)

and 18 U.S.C. § 844 (e) (Telephonic Threats).  Prior to joining NCIS, I worked for the Federal

Bureau of Prisons for three years as a Correctional Officer.  My education includes a Masters of

Arts in Criminal Justice and a Bachelor of Science in Criminology and Criminal Justice.  I have

training and experience in the enforcement of criminal statutes within the United States Code,

including the preparation, presentation, and service of arrest and search warrants.  I am currently

assigned to General Crimes and I have received basic training in criminal schemes perpetrated

via the internet.  As a federal agent, I am authorized to investigate violations of laws of the

United States, and as a law enforcement officer I am authorized to execute warrants issued under

the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, witnesses, and agencies.  This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant.  It

does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that violations of (1) Interstate

Transmission of Threats in Interstate Commerce, in violation of 18 U.S.C. § 875(c), and (2)

Willfully Making a Threat, in violation of 18 U.S.C. § 844(e), have been committed by Anthony

M. Reid ("Reid").  There is also probable cause to search the Devices, further described below

and in Attachment A, for the things described in Attachment B.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5.      The property to be searched is a (1) Silver Maxtor Hard Drive, Serial Number A3BFPDGC; (2) Passport Hard Drive, Serial Number WX81A75FSPFJ; (3) Black Verizon Motorola Cellular Telephone, Model Number XT912; (4) Black front and Silver back IPOD, Serial Number CCQN7FHFMJF and Model Number A1421; (5) Black and Red San Disk USB; (6) Red or Purple and Silver USB; (7) Silver Memorex CD; (8) Silver Memorex CD; and (9)Sony VAIO Laptop Computer, Model Number SVF242C2PL, that is, the "Device**s**."

6.      The Device**s** are currently located at **Naval Criminal Investigative Service DCWA Evidence Repository, 2713 Mitscher Rd., Building #168, Suite 200, Washington, D.C. 20373.**

**PROBABLE CAUSE**

7.      On January 30, 2012, Reid joined the United States Marine Corps.  On May 19, 2017, at a Special Court Martial and pursuant to a Pre-trial Agreement, Reid pled guilty to an Article 128 violation, Assault by Battery, in violation of the Uniformed Code of Military Justice ("UCMJ").  As a result, he received a Bad Conduct Discharge, was ordered to forfeit $1066 for 3 months, and was sentenced to confinement for 90 days.

8.      On or about January 28, 2019, Reid called Rebecca Snyder, Acting Appellate Director of the Navy-Marine Corps Appellate Division of the Office of the Judge Advocate General, U.S. Navy, at the Navy Yard in Washington, D.C.  Reid called Ms. Snyder at her job regarding his criminal appeal.  During that telephone conversation, Reid identified himself as "Anthony Reid" and spoke with Ms. Snyder about his appeal.  That same day, Reid called back Ms. Snyder, said that he was going to file a complaint with the Inspector General, and would

"bring down the system."  Ms. Snyder referred Reid to a Lieutenant Commander for further assistance.

9.      On May 6, 2019, Reid called Ms. Snyder multiple times at her job.  Reid called from telephone number (518) 528-4264.  During the first telephone conversation, Reid was furious and said that he was framed (referring to his conviction).  Ms. Snyder tried to calm down Reid but was unable to do so.  Reid wanted the Secretary of the Navy's contact information and was angry that Ms. Snyder did not have it readily available to provide.  Ultimately, Ms. Snyder hung up on Reid because she could not have a productive conversation with him.  That telephone conversation was not recorded.

10.      During the second telephone conversation that same day, Reid was cursing and yelling at Ms. Snyder and told her "I am coming after you" and "you are going to pay for what you did."  Reid also said that the first law enforcement officer to come into contact with him will be a martyr.  That telephone conversation was not recorded.  Thereafter, that same day Reid called Ms. Snyder at least four more times.  Ms. Snyder did not answer those telephone calls because she recognized the telephone number that Reid had used to call her earlier that day.

11.      Also on May 6, 2019, Reid left a voice mail message on Ms. Snyder's work telephone.  Law enforcement obtained a copy of that voice mail message.  Before the message is played, the recording states "voice call from extension 518-528-4264."  During that voice mail message, a male voice said, "I'm waiting for you to report me [sic], go ahead, go ahead and report those threats that I communicated because I have some that were communicated to me that I would like people to know about."  The male also said that he had already posted the emails on line.

5

Also on May 6, 2019, Reid sent several emails to Ms. Snyder's work email address. For all of Reid's emails, his name "Anthony Reid" and email address "amreid21@hotmail.com" were included in the "From" category.  On May 6, 2019, at approximately 10:23 a.m., Reid sent the following email to Ms. Snyder: Your bosses' professional POC, give it to me now!  And you also need to tell me who their boss is and that person's so when I figure out that you're just stalling, I can move on to the next law breaking terrorist rogue commander.

Additionally, you need to be working around the clock to find out how I'm going to report you to SECNAV.

Best Regards

A.M. Reid

12.      At Approximately 10:39 a.m. that same morning, Ms. Snyder sent a reply email to Reid stating that she had copied her supervisor and stated his name.  Later that same morning at approximately 10:51 a.m., Reid sent an email to the complaining witness that stated:

You made so many excuses for why Jacque has such a delay in communication but you don't have any excuses so why am I still waiting for your bullshit reply?  Also could you go ahead a forward your complaints to the appropriate authority.  You did communicate to me on the phone that you feel threatened by me. And you should.

You have served beyond your usefulness lol.

A.M. Reid

13.      At approximately 11:37 a.m. that same day, Reid sent the following email to Ms. Snyder:

Lol another Colonel huh?  You people seem to have trouble reaching someone who wears stars.  I don't care about Col. [name

redacted].  But give me his bosses' poc tho.  No 0-6 could ever be the final over all approval authority.

I'm learning a lot about corruption from you.  Anytime I am referred to someone lower than a General then I won't accept what is being said at face value.  I'm sure there are generals in your office which I why you people are off the meter right now with this bullshit you are currently on.

I hope you get hit by a car on your way home today. I hope you don't make it. Lol. I hope you rip your pants when you sit down. I hope someone puts a thumb tack in that same chair. I hope you spill hot coffee on yourself. I hope you do your job with integrity and honesty. I hope you believe in the navy's core values. I hope you believe in the U.S. Constitution. I hope you have faith in the justice system. I hope you believe in fairness and equality. I hope you know you suck. I hope you step in dog shit. I hope someone rings your doorbell and run. I hope your next delivery from amazon comes a day late. I hope you get trapped in a corner with an angry feral cat. Avoid zoos too, because I hope you fall into a gorilla enclosure and get fucked up, that shit would be funny AF my guy. I hope these emails get you all fired. I hope you suffer worse than i have. I hope you'll find this funny someday. I hope you don't take this seriously like you don't take your responsibilities and obligations seriously.

I hope you have a nice day.

And I also hope someone fucks it up lol.

Best Regards

A.M. Reid

14.     At approximately 12:37 p.m. that day, Reid sent an email to Ms. Snyder that contained a screenshot of the internet home page of the U.S. Navy Judge Advocate General's Corps.  Circled in red was the division where Ms. Snyder works.  Also on that home page were the mailing address and telephone numbers for Ms. Snyder's employer.  Your affiant believes

that Reid was informing Ms. Snyder that he knew where she worked.  That same afternoon at approximately 1:25 p.m., Reid sent another email to Ms. Snyder that included the following statements:

> No reply?  What's wrong?  Did I say something that hurted your tiny feelings?  Lol I've decided that you're going to be contacted by me for the rest of your natural existence lol.  This is fun to me. Since I can go to college or work, I will bother you instead college girl.

> So how do you feel about my language now?  Is it threatening yet? Do you feel threatened by me?  Are you feeling unsafe lol?  Do you feel secure in your little standard issue office?

> I don't feel safe at all.  I feel very threatened by your action and or lack of.  I don't feel secure anywhere.  So you better pick up your phone every day that why I can feel somewhat safe knowing that you are not in New York.

> Lmfao "threatening language"

> You're a big pussy lol. A real genuine coward.  I'm glad this is going to your .mil account.  You can look at this.

Reid then included an email dated September 7, 2016, that he had sent to another person in the Marine Corps.  That email was from "Reid LCpl Anthony M <anthony.reid@usmc.mil>.  In that September 7, 2016, email Reid identified himself as "Pvt Reid," he discussed a general court marshal, and that he was told that he was going back to Okinawa for what he thought may be another scheduled Article 32.  Reid further stated in the September 7, 2016, email that he was resending the email from his "personal," which was a reference to his personal email account.

Also, the Cc: category listed the email address "amreid21@hotmail.com" - the same email account from which Reid was sending emails to the complaining witness.

15.     Later that same afternoon, at approximately 4:53 p.m., Reid sent another email to the complaining witness that stated in relevant part,

> How's life? Do you like being able to breathe? Do you like being able to live? Do you like not being fucked with?  Do you guys hug your family after a long day of being a scumbag?  I don't hug my family.  They all left me because they believe in. . . .

> \* \* \* \*

> I hope you all have people counting on your ability to be employed and live a healthy life. I'm going to fuck that all up lmao! You all better act fast because I promise you that this will not be an issue in my life before 2020 gets here. Not fucking around. One way or another, I will eliminate you all from my life this could have been handled at the Lowe's level.  My CO could have disposed of those charges is he had done his job.  So fuck y'all.  Please report my "threatening language" like you said you were.  But not to another one of your but-buddies.  Report me to the next highest authority.

> So let's see. Hmm after JAG of the navy there is ummm. . . . oh SECNAV.

> You people are basically terrorist, you understand that?  This is terrorism.  Your actions destabilize Government continuity and efficiency.  And you wear the same uniform as I, that make you all an inside threat.

> A.M. Reid

In one of the emails that Reid had sent to Ms. Snyder, he included a written memorandum that was on United States Marine Corps letterhead that was addressed to him while he was in the Marine Corps.

16.     Later that same day, at approximately 4:43 p.m., Reid emailed his Facebook link to the complaining witness.  During the investigation, law enforcement reviewed the content of Reid's Facebook page.  On May 5, 2019, at 5:55 p.m., a post was on Reid's Facebook account that read:

> How does one gain access to the dark web?
>
> Google is useless… too heavily sanctioned for me to search for simple things such as; optics opposite of inferred.
>
> This is supposed to be a free market so finding specs on building UV optics shouldn't be difficult when the market for inferred optics is so vast.

In this Facebook post, Reid may have been referring to building a device to enhance weapon capabilities.

17.     On May 6, 2019, the following message was posted on Reid's Facebook account:

> They are running from me.  I called Rebecca Snyder just now and she said to me that all of the concerns that I've presented to her were vague and unsubstantiated and does not warrant reopening my case!
>
> VAGUE?!  Are you deadass my nigga!  She hung up on me before I was actually able to threaten her.  She deserves to die, a long with everyone else responsible for my situation.  Clearly they have figured out how to avoid prison but I'm sure they can still be killed.  This power they rely on sooo much doesn't grant immortality or invincibility lol. I'm done talking.  If I see someone come out of a government vehicle and into my apartment building, that person or people are now very likely to come under attack.  This is what I've been waiting for.
>
> The first person to call my bluff is the first martyr.  Nothing is taken seriously until someone dies.

That same day at approximately 3:03 p.m., the following message was posted on Reid's

Facebook account:

> Lol last week I had 40 Friends now I'm down to 36.  It was 37 but
> I just deleted someone for never replying to my messages.
>
> So if you don't really care about me or my posts then just begone,
> I'm about to be homeless now so my rage and anger only increases
> from here.

18.  Later that same day at approximately 3:45 p.m., the following post was on Reid's

Facebook account:

> Lmfao come for me then!  Just keep in mind, I didn't strike first.
> Everything I'm doing is to protect myself.  Self defense is defense
> of self.  I'm not being defended by the DOD, I'm being attached.
> Time to strike back.  Doesn't seem like they're interested in justice
> to me so I guess this is just a vendetta.

A few minutes later, at 3:49 p.m., the following post was on Reid's Facebook account:

> This shit worries me everyday because these individuals know that
> I'm not going to let this go.
>
> They have already crossed the planet to keep these lies quiet and
> here I am home side, and they're still keeping it up.
>
> What's the point in leaving it to MY imagination to wonder how
> far these people will go to cover their ass. That is very dangerous. .
> . .

19.  Later that evening, at approximately 8:13 p.m., the following message was posted

on Reid's Facebook account:

> I promise you that won't make anyone an accessory but this is
> everyone's one and only chance to NOT be associated with me
> because I am going to hurt people.  It's not an "if" deal.  It's

> "when" type of thing.  So right now is your only chance to
> downgrade from friends to acquaintance or anything lesser.  Any
> from here on out, anyone who suggests I get over the past is a
> target to me.  You must be friend of Rebecca or Ashley or Alex or
> Brett or Andrew.  There's only a short 13 names on my kill list.
> Don't fuck around and end up as a bench warmer on my roster.

Your affiant believes that Ms. Snyder's first name, Rebecca, is the "Rebecca" listed in this post.

20.     On May 9, 2019, the following message was posted on Reid's Facebook account:

> None of my "threats" are true, I posted them here to give these
> dickheads the support the need to report me to the authorities.  And
> the did not.  Funny how one white girl says I touched her, I'm on
> jail in hours. One white But when it comes to me just trying to get
> my car back, all the white people tell me "no".  Like how did it
> even come to this?  All I ever really did was work and play my
> PS4.

Also on Reid's Facebook account was a photograph that included Reid who was dressed in military clothing.

21.     During the investigation, law enforcement obtained the telephone number that Reid had used to call the complaining witness.  Investigations conducted at that time revealed that it was a cellular telephone with no subscriber information and that the service provider was Sprint.  With the assistance of the Metropolitan Police Department of the District of Columbia, on May 8, 2019, law enforcement began to track that cellular telephone number on an emergency basis.  Geolocation data revealed that during the week of May 6, 2019, that cellular telephone was in the Bronx, New York.

22.     On May 10, 2019, the Honorable G. Michael Harvey of the United States District Court for the District of Columbia authorized the issuance of arrest warrant for Reid and a

Criminal Complaint that charged one count of Transmitting Threats in Interstate Commerce, in violation of 18 U.S.C. § 875(c).       On May 11, 2019, a special agent with the NCIS New York Field Office and other members of law enforcement went to an apartment in the Bronx, New York, where they believed Reid resided, to execute the arrest warrant for him.  Reid was not at home at that time.  However, law enforcement spoke with two family members of Reid who lived in the apartment and confirmed that the Reid lived there.

23.       On May 13, 2019, law enforcement returned to the apartment where Reid lived in the Bronx, New York, to execute the arrest warrant for him.  Law enforcement knocked on the apartment door and no one answered.  Law enforcement rang the doorbell.  Reid opened a window to the outside walkway and could be seen by law enforcement.  The NCIS special agent previously had viewed a photograph of Reid, observed him, and confirmed that it was Reid. The NCIS special agent informed Reid that they had a warrant for his arrest, asked whether he was Anthony Reid, and showed him a copy of the arrest warrant.  Reid confirmed his identity, said that he did not believe that the warrant was legitimate, and that he was not going to obey it.  Law enforcement again showed Reid a copy of the arrest warrant.  The NCIS special agent heard someone putting heavy things down in front of the apartment's front door in what sounded like an effort to barricade the apartment front door to prevent entry.  Members of law enforcement continued to talk to Reid who remained inside the apartment.  Reid refused to open the apartment front door and was not cooperative.  After law enforcement made numerous attempts to have Reid open the apartment door, due to safety concerns for one of Reid's family members believed to have been inside the apartment at that time, law enforcement breached the apartment front

door.   Upon entry into the apartment law enforcement confirmed that Reid had barricaded the apartment front door.   Reid was taken into custody and arrested.

24.     While inside the apartment law enforcement conducted a security sweep and observed in plain view in an opened bag in Reid's bedroom what appeared to be an AR-15 type rifle with a collapsible stock.   On May 13, 2019, the Honorable Stewart D. Aaron of the United States District Court for the Southern District of New York authorized a search warrant for the apartment where Reid lived in the Bronx, New York.   During the execution of the search warrant, law enforcement recovered several items, including the AR-15 type rifle with a collapsible stock that had what appeared to be an attached scope.   No ammunition was recovered.

25.     Reid used the email address, amreid21@hotmail.com.   Reid also used Sprint cellular telephone number (518) 528-4264 to contact Ms. Snyder.   Additionally, he sent to Ms. Snyder the following link to his Facebook account: https://www.facebook.com/100031726822319/posts/135596617507898?s=100031726822319&v=i&sfns=mo.

26.     Based upon the investigation conducted to date, the names of the individuals on Reid's kill list have been connected to his court martial proceedings, appeal process/proceedings, or his military service.

27.     The devices seized from the home where Reid resided were found in his bedroom and are believed to be his devices. These are likely means to the commission of violations of 18 U.S.C. § 875(c) (Interstate Communications of Threats) and 18 U.S.C. § 844 (e) (Telephonic Threats) and/or contain evidence of the commission of the above crimes. Your Affiant believes

Reid utilized these technological devices to transmit threats. A telephone was used to call Ms. Snyder where telephonic threats were communicated. The cellular telephone number 518-528-4264 used to contact Ms. Snyder was a Sprint phone with no subscriber information. Searching the Black Verizon Motorola Cellular Telephone Model number XT912 could reveal the telephone number associated with the device and establish Reid as the user. Other information and/or records collected including the call logs can corroborate the calls made to the victim. This Black Verizon Motorola Cellular Telephone is also likely to have the capability to access internet applications such as Hotmail and Facebook. Reid used the email amreid21@hotmail.com to send communications with Ms. Snyder. The email amreid21@hotmail.com is linked to the Facebook account where threats were posted for public view. The Sony VAIO Laptop Computer, Model Number SVF242C2PL, is also likely to have the capability to access the same internet applications. Searching this item would reveal stored communications and establish Reid as the user. The digital storage media items - the Silver Maxtor Hard Drive, Serial Number A3BFPDGC; the Passport Hard Drive, Serial Number WX81A75FSPFJ;  the Black front and Silver back IPOD, Serial Number CCQN7FHFMJF and Model Number A1421; the Black and Red San Disk USB;  the Red or Purple and Silver USB; the Silver Memorex CD; and the Silver Memorex CD - may contain other information of evidentiary value. This is to include information and/or documented interactions with the individuals on the "kill list" from Reid's court martial proceedings, appeal process/proceedings or military service, and further establishing ownership of the devices and usage.

28.     The Devices are currently in the lawful possession of the NCIS and stored at Naval Criminal Investigative Service DCWA Evidence Repository, 2713 Mitscher Rd., Building

#168, Suite 200, Washington, D.C. 20373.  The Devices came into the NCIS's possession in the following way:  On May 13, 2019, law enforcement recovered the Devices during the execution of the search warrant at the defendant's residence in the Bronx, New York.  The NCIS New York Field Office took initial custody of the Devices on May 13, 2019.  On June 6, 2019, the Devices were transferred to the NCIS Washington Field Office.  On June 7, 2019, the Devices were received by the NCIS Washington Field Office and placed into the DCWA Evidence Repository.

## TECHNICAL TERMS

29.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.

17

These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

          c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

          d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the

Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

       i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

       ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

       o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections,

encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

30.     Based on my training, experience, and research, I know that the Device – the Black Verizon Motorola Cellular Telephone, has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other

things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

31.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

32.     Individuals who engage in criminal activity, including the transmission of threats in interstate commerce and willfully making a threat, use digital devices, like the Device, to access websites to facilitate illegal activity, to communicate with co-conspirators, and to find the means to carry out the threats; to store on digital devices, like the Devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; personal identification data, including names, addresses, and telephone numbers of the victims; and records of transactions, research and communications for future use and exploitation.

33.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

34.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

35.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

36.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory

card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

37.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

38.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

39.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed

along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

40.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

41.     I know that when an individual uses a digital device to make and transmit threatening communications in interstate commerce by electronic communications and social media websites, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

42.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

30

text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

   e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

43.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

44.   Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit

that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

45.    I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Kelli Johnson, Special Agent
NCIS

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 25, 2019.

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE